USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/17/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BENIHANA INC.,

                        Petitioner,

-v-

BENIHANA OF TOKYO, LLC,

                        Respondent.

18 Civ. 7506 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This case is the latest in a series of related lawsuits dating to 2013 between Benihana Inc. ("BI") and Benihana of Tokyo, LLC ("BOT") concerning a Benihana restaurant in Honolulu, Hawaii that BOT has long operated pursuant to a license agreement with BI. Dkt. 1-1 (the "License Agreement"). At issue here is an August 13, 2018 arbitral award. Dkt. 1-2 (the "Award"). BI moves to confirm that Award, which upheld as reasonable BI's termination of the License Agreement, with one exception: BI moves to vacate the part of the Award which declined to grant BI attorneys' fees and costs in connection with the arbitration. BOT does not oppose confirmation of the Award. However, it opposes BI's motion to vacate the denial of fees and costs.

For the reasons that follow, the Court denies BI's motion to vacate the denial of fees and costs and confirms the Award in full.

## I.    Background

The Court assumes familiarity with the history of lawsuits between the parties over the past five years, a number of which have come before this Court, either directly or on review of arbitral decisions. *See, e.g., Benihana of Tokyo, LLC v. Benihana, Inc.*, 73 F. Supp. 3d 238

(S.D.N.Y. 2014) ("*Benihana I*"); *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887 (2d Cir. 2015) ("*Benihana II*"); *Benihana, Inc. v. Benihana of Tokyo, LLC*, No. 15 Civ. 7428 (PAE), 2016 WL 3913599 (S.D.N.Y. July 15, 2016) ("*Benihana III*"); *Benihana of Tokyo, LLC v. Benihana, Inc.*, No. 14 Civ. 224 (PAE), 2017 WL 1424325 (S.D.N.Y. Apr. 19, 2017) ("*Benihana IV*"); *Benihana of Tokyo, LLC v. Benihana, Inc.*, No. 14 Civ. 224 (PAE), 2018 WL 3574864 (S.D.N.Y. July 25, 2018) ("*Benihana V*"), *appeal filed*, No. 18-2328 (2d Cir. Aug. 7, 2018); and *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16 (S.D.N.Y. 2017) ("*Benihana VI*"), *aff'd*, 712 Fed. App'x 85 (2d Cir. 2018).[1] The Court, drawing on the Award and on these decisions, recounts here only the limited background necessary to give context to the discrete issue presented.

A.  **The ARA and the License Agreement**

In 1963, BOT was incorporated by Rocky Aoki. In 1964, he opened the first Benihana restaurant in New York City. The Benihana restaurant empire today, however, is operated by two distinct corporations: BOT and BI. Pursuant to a contract entitled the Amended and Restated Agreement and Plan of Merger ("ARA"), executed on December 29, 1994 and amended March 17, 1995, BI received the right to operate Benihana restaurants and to own and use Benihana trademarks in the United States, Central America, South America, and the Caribbean ("the Territory"). BOT retained the rights to operate Benihana restaurants and to use Benihana trademarks outside the Territory.

The sole exception to the territorial division is Hawaii. The ARA provides that BI would grant BOT a license to continue operating the flagship Benihana restaurant in Honolulu.

---

[1] *See also, e.g.*, *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 622 Fed App'x 169 (3d Cir. 2015); *Benihana of Tokyo, LLC v. Angelo, Gordon & Co.*, No. CV 15-00028 (ACK) (RLP), 2015 WL 5439357 (D. Haw. Sept. 14, 2015).

2

The License Agreement, in turn, sets out the terms of BOT's operation of that restaurant. It gives BOT a perpetual, royalty-free license, subject to its terms, to operate Benihana restaurants in Hawaii. In its opening "Whereas" clauses, the License Agreement recites that BI and BOT entered into it "in consideration of the transfer by [BOT] to [BI] of certain assets of [BOT's] pursuant to" the ARA. License Agreement at 3. These clauses further recite that BI "has created and developed a unique and distinctive system of high-quality restaurants"; that BI "is the sole and exclusive owner of all proprietary and other property rights and interests in and to certain trade names, service marks, trade marks, logos, emblems and indicia of origin, including . . . 'Benihana', 'Benihana of Tokyo' and the 'flower' symbol" (the "Marks"); that BI develops, uses, and controls these Marks "to represent the System's high standards of quality, appearance, and service"; that BOT "acknowledges the importance of [BI's] high standards of quality, appearance and service"; and that BOT "acknowledges the importance of [BI's] high standards of quality, cleanliness, appearance and service and the necessity of operating the business franchised hereunder in conformity with [BI's] standards and specifications." *Id.* at 2–3.

The License Agreement sets out detailed provisions governing BOT's operation of the Honolulu restaurant and related subjects. These subjects include BOT's use of Benihana marks; its advertising; its food sales; its insurance coverage; BI's rights to terminate the agreement; the process of dispute resolution, including a provision for arbitration; and the choice of law (New York law). *Id.* §§ 5–8, 12–13, 17.7.

**B.     The September 2015 Arbitral Award**

In recent years, BI has brought a series of claims of violations by BOT of provisions of the License Agreement, claims which have been largely if not overwhelmingly sustained by this

3

Court and/or by arbitral panels. The Court's decision in *Benihana III*, in which it confirmed a September 2015 arbitral award, set out the governing provisions of the License Agreement and canvassed the history of BI and BOT's disputes as to such claims through mid-2016. *See Benihana III*, 2016 WL 3913599, at *2–9.

*Benihana III* is important context for the instant dispute. At issue there was an arbitration initiated after BI terminated the License Agreement based on a series of material breaches by BOT which BOT had failed to cure. These breaches largely involved BOT's persistently non-compliant practices with respect to marketing, including the use of Benihana marks and unauthorized menu items. In its September 18, 2015 Award, the three-member arbitral panel made extensive findings of fact, including finding, unanimously, that BOT had committed multiple material breaches of the License Agreement. However, by a 2-1 margin, the panel read the License Agreement to provide that termination for material breaches could occur only where doing so was "reasonable." And, the panel majority held, it had not been reasonable under the circumstances for BI to terminate. The panel put in place instead an injunction against future breaches by BOT, so as to make future breaches, assuming judicial confirmation of the award, sanctionable as contempt. *Id.* at *6–9.

BI then moved to confirm the portion of the award that found material breaches by BOT, while moving to vacate the portion that found the remedy of termination unavailable. In its July 2016 decision, this Court confirmed the Award in its entirety. Although finding the dissenting arbitrator's view that termination had been reasonable to be more persuasive, the Court held that, given the limited scope of judicial review of arbitral decisions, it lacked authority to vacate the portion of the Award finding termination an unreasonable remedy under the circumstances. The

Court adopted as a court order the injunction that the panel had put in place against future breaches. *Id.* at *11–22.

Following the 2015 arbitration, BI brought various claims of violations of the injunction before this Court, including relating to BOT's marketing, menu, and signage practices. In June 2017, the Court, in a lengthy bench decision issued after an evidentiary hearing, found overwhelmingly for BI, found BOT in contempt, and ordered various forms of relief. *See Benihana III*, No. 15 Civ. 7428, Dkt. 96 (transcript of June 14, 2017 hearing, or "Tr."). With respect to each separate violation alleged by BI, the Court found that "BOT's actions were too halting and too anemic, too little, and too late." Tr. at 417. The Court found that any attempt at compliance by BOT had largely been attempted only *after* BI had filed for contempt, and so ordered BOT to pay BI's legal fees. *Id.* at 436–37. The Court declined to order actual damages because of a lack of record evidence, and so imposed only $1 in nominal damages. *Id.* at 438–40. The Court finally imposed a set of "muscular conditions" which fined BOT large daily or incident-based amounts for related future violations of the injunction, *id.* at 440–44, and required BOT to pay for 24 visits from a BI investigator over the year to check for violations, *id.* at 444–45.

C. **The Present Arbitration**

On April 13, 2016, BOT initiated the arbitration at issue here.[2] It alleged that BI had breached the License Agreement by unreasonably withholding approval—ostensibly in violation

---

[2] The same day, BOT filed an action in New York state court against BI and Angelo Gordon, the private equity firm that manages the fund that owns BI, claiming that BI, by "unreasonably withholding" approval, had breached the ARA, and that Angelo Gordon had tortiously induced this breach. After BI removed the lawsuit to federal court, this Court held that Angelo Gordon had been fraudulently joined to defeat diversity and that the claims against BI failed as a matter of law. *See Benihana VI*, 259 F. Supp. 3d at 32, 36–37. The Second Circuit affirmed. *See* 712 Fed. App'x 85 (2d Cir. 2018).

5

of Articles 5 and 8 of that Agreement—for, among other things, menus, advertisements, coupons, and signs using the Benihana trademarks governed by the License Agreement. On June 23, 2017, BOT amended its arbitration demand to add a claim that BI had also breached the License Agreement by preventing BOT from opening a new Benihana restaurant in Hawaii.

On March 17, 2017, BI brought a counterclaim. BI asked the panel to find that BOT had itself materially breached the License Agreement by repeatedly refusing to comply with various brand standards governing, among other things, BOT's menus, advertisements, coupons, and signs, including through the conduct that this Court had held in 2017 to have violated the injunction the Court had put in place in *Benihana III* in the course of confirming the arbitral award there. Critical here, BI also asked the new panel to uphold its termination on February 27, 2017, of the License Agreement, based on BOT's noncompliance with the agreements, including by violating the injunction the Court had put in place in July 2016. BI requested attorneys' fees pursuant to Article 8.5 of the License Agreement.

A four-day hearing was held in March 2018 before a three-person panel of the American Arbitration Association.

In its Award, issued August 13, 2018, the panel denied all of BOT's claims, finding them "unsupported by any facts" and "little more than a waste of time and money." Award ¶¶ 71, 74; *see also id.* ¶¶ 25–50 (discussing and rejecting BOT claim that BI had unreasonably withheld approvals); *id.* ¶ 19 (holding that BI had not, in fact, prevented BOT from opening another restaurant); *id.* ¶¶ 51–54 (finding that BOT had entered into unauthorized contracts with a third-party photographer in violation of the brand standards and Article I of the License Agreement).

As for BI's counterclaim, the panel majority concluded that, in light of BOT's repeated violations of the License Agreement, "BI had good cause to terminate under the License

Agreement and its decision to terminate was clearly reasonable." *Id.* ¶ 71.³ The panel noted that, "[s]ince the 2015 arbitration award, BI had sent BOT numerous notices of default that BOT failed to cure within 30 days, including ones concerning unapproved coupons, print advertisements, menus, and signs." *Id.* ¶ 67. The panel further found that BOT "is still out of compliance with the obligation to serve the full sushi menu consistent with brand standards" and that "such a failure alone constitutes a material breach." *Id.* ¶ 73.

The panel majority found BOT's breaches to be "by definition material" and therefore justifying termination. It noted that "Article 8.4 of the License Agreement provides that BOT 'acknowledges and agrees that any failure to comply with the covenants and agreements in this Article 8, or with the covenants and agreements in Article 5 hereof with respect to the Marks . . . , shall constitute a material event of default under this Agreement.'" *Id.* ¶ 68 (quoting the License Agreement). To the panel, that BOT had refused to comply with the "permanent injunction . . . mirroring Articles 5 and 8 of the License Agreement," *id.* ¶ 60, and "had to be held in contempt of court before finally complying," *id.* ¶ 71, made termination all the more reasonable, as did BOT's "repeated and continued breach—and indifference to the [L]icense [A]greement." *Id.* ¶ 84.

The panel, however, declined—unanimously—to award BI attorneys' fees and costs. BI had requested such fees and costs pursuant to Article 8.5 of the License Agreement, which states that BOT "agrees to pay all costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by [BI] in connection with the enforcement of this Article 8 or of

---

³ The dissenting arbitrator concurred that the evidence had established breaches by BOT, but concluded that the termination had been unreasonable, and that lesser means existed, including through pursuit of contempt sanctions, to assure BOT's future compliance. *See generally* Award at 26–39 ("Dissenting Opinion of Arbitrator Zuffranieri").

Article 5 provided that [BOT] is determined to be the breaching party." License Agreement § 8.5. BI tabulated in its post-hearing briefs that it had incurred $1,548,381.50 in fees and $304,114.04 in costs. *See* BI Mem. at 6.

The panel's discussion of its bases for denying fees were confined to the final paragraph of its Award. The panel majority wrote:

> Pursuant to Article 8.5 of the License Agreement, BOT "agree[d] to pay all costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by [BI] in connection with the enforcement of this Article 8 or of Article 5 provided that [BOT] is determined to be the breaching party." [License Agreement] § 8.5. However, the present arbitration was commenced by BOT, not by BI seeking to enforce the Agreement. By way of counterclaim, BI only sought to terminate the agreement, rather than enforcing it. The Panel also is mindful of the cost to BOT of the termination and potential financial benefit to BI in taking back the Benihana trademark in Hawaii. Accordingly, the panel does not consider an award of attorney fees and costs pursuant to Article 8.5 mandatory or appropriate.

Award ¶ 88. The dissenting arbitrator agreed as to the denial of fees. He wrote:

> Due to the limited declaratory relief requested by BI, the significant financial loss to BOT, and financial gain by BI, I fully support the panel's conclusion not to award costs and fees in this proceeding. Moreover, BI previously obtained an award of costs and attorneys' fees from the District Court for [] its efforts to compel compliance with the terms of the License Agreement and permanent injunction.

*See* Dissenting Opinion of Arbitrator Zuffranieri ¶ 31 n.12; *see also id.* ¶ 31 (noting that "the Honolulu restaurant has real value," as "proven by BI's actions in trying to acquire it"; that the loss to BOT from termination will be substantial; and that "[t]ermination will result in a financial windfall to BI").

### D.     This Action

On August 17, 2018, BI initiated this action. It filed a petition (1) to confirm the arbitral Award and (2) to vacate "the single paragraph of the award in which the arbitrators declined to grant BI attorneys' fees and costs incurred during the arbitration." Dkt. 1 ("Pet.") at 1 (citing

8

Award ¶ 88). On October 12, 2018, BI filed a memorandum of law in support. Dkt. 14 ("BI Mem.").

On October 26, 2018, BOT filed a memorandum of law in partial opposition. Dkt. 15 ("BOT Mem."). BOT stated that it did not oppose BI's petition to confirm the arbitral Award, BOT Mem. at 1 n.1, but opposed only BI's bid to vacate the paragraph of the Award denying BI fees and costs. On November 9, 2018, BI filed a reply memorandum. Dkt. 16 ("BI Reply").

## II. Discussion

The only part of the Award in dispute here is the panel's denial to BI of attorneys' fees and costs. As to the balance of the Award, BI petitions for its confirmation. BOT, for its part, does not oppose confirmation of any part of the Award, including the determination that BI's termination of the License Agreement was proper.

The Court has carefully reviewed the Award. On the limited review permissible, the Court upholds the balance of the Award. The panel majority's careful decision reveals ample bases for the aspects of the Award that BI seeks to confirm. In particular, its determination that BI's termination of the License Agreement was justified was well-founded, based as it was on BOT's long-running, intentional, and flagrant violations of multiple provisions of the License Agreement.

The Court therefore will confirm the balance of the Award. The Court focuses its discussion here solely on the denial of fees and costs.

### A. Applicable Legal Principles

In seeking to void the panel's ruling as to fees and costs, BI faces the same imposing standard of review that it faced when, in 2016, it similarly sought, unsuccessfully, to overturn one portion of an otherwise favorable arbitral award. The Court there canvassed at length the

governing legal principles. *See Benihana III*, 2016 WL 3913599, at *10–11. The Court incorporates those principles here.

In brief, the Federal Arbitration Act ("FAA") authorizes a district court to review an arbitral award and to "confirm and/or vacate the award, either in whole or in part." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006) (citing *Hoeft v. MVL Grp., Inc.*, 342 F.3d 57, 63 (2d Cir. 2003)). Specifically, the FAA permits any party to an arbitration to seek vacatur of an award where the arbitrator, *inter alia*, "exceeded [her] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). The moving party bears "the burden of proof, and the showing required to avoid confirmation is very high." *Wells Fargo Advisors, LLC v. Sappington*, 328 F. Supp. 3d 317, 322 (S.D.N.Y. 2018) (quoting *STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 74 (2d Cir. 2011)). The Court's review is "severely limited, so as not to frustrate the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71–72 (2d Cir. 2012) (internal quotation marks and citations omitted). Accordingly, the Court owes "strong deference" to "arbitral awards and the arbitral process." *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 138 (2d Cir. 2007).

The Second Circuit has held that "[a]n arbitrator exceeds [her] authority only by (1) 'considering issues beyond those the parties have submitted for [her] consideration,' or (2) 'reaching issues clearly prohibited by law or by the terms of the parties' agreement.'" *Anthony v. Affiliated Computer Servs., Inc.*, 621 F. App'x 49, 51 (2d Cir. 2015) (quoting *Jock v. Sterling Jewelers, Inc.*, 646 F.3d 113, 122 (2d Cir. 2011), *cert. denied*, 565 U.S. 1259 (2012)). The Second Circuit has "consistently accorded [Section 10(a)(4)] 'the narrowest of readings.'"

*Anthony*, 621 F. App'x at 50–51 (quoting *Jock*, 646 F.3d at 122). Whether the arbitrator correctly decided an issue is *not* the question before the reviewing court. *See id.* at 52 ("[W]e do not consider whether the arbitrators correctly decided the issue." (internal quotation marks and citations omitted)).

An arbitral award may also be vacated if it exhibits a "manifest disregard" of the law. *Tully Constr. Co. v. Canam Steel Corp.*, 684 F. App'x 24, 26 (2d Cir. 2017) (citation omitted). "The manifest disregard standard, rather than substantially broadening the grounds for vacatur, largely operates as a judicial gloss on the specific grounds for vacatur enumerated in section 10 of the FAA." *Benihana III*, 2016 WL 3913599, at *10 (internal quotation marks and citation omitted). The moving party bears the heavy burden of showing that (1) "the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators," (2) "the law was in fact improperly applied, leading to an erroneous outcome," and (3) "the arbitrator . . . kn[ew] of its existence, and its applicability to the problem before him." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 390 (2d Cir. 2003) (citations omitted). The Second Circuit has emphasized that vacating an arbitral award for manifest disregard of the law "is a doctrine of last resort," reserved for "those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply." *Id.* at 389. Accordingly, manifest disregard of the law "means more than error or misunderstanding with respect to the law." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986) (citations omitted).

Under either standard, the petitioner must do more than show "that the [arbitrator] committed an error—or even a serious error." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) (citations omitted). Instead, "[i]f there is 'even a barely colorable

11

justification for the outcome reached,' the court must confirm the arbitration award." *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 13 (2d Cir. 1997) (quoting *Matter of Andros Compania Maritima, S.A.*, 579 F.2d 691, 704 (2d Cir. 1978)).

**B.      Discussion**

This case calls for application of these principles in the context of a contract dispute. In this context, the Supreme Court has instructed, "[i]t is only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable." *Stolt-Nielsen*, 559 U.S. at 671 (2010) (alterations, citations, and internal quotation marks omitted).

Arbitral awards turning on the construction of a contract therefore must be confirmed even if a reviewing court has "serious reservations about the soundness of the arbitrator's reading of [the] contract." *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 216 n.10 (2d Cir. 2002). "Whether the arbitrators misconstrued a contract is not open to judicial review." *Bernhardt v. Polygraphic Co. of Am.*, 350 U.S. 198, 203 n.4 (1956) (citations omitted). "[V]acatur for manifest disregard of a commercial contract is appropriate only if the arbitral award contradicts an express and unambiguous term of the contract or if the award so far departs from the terms of the agreement that it is not even arguably derived from the contract." *Westerbeke*, 304 F.3d at 222; *see also T. Co. Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010) ("With respect to contract interpretation, [the manifest disregard] standard essentially bars review of whether an arbitrator misconstrued a contract.").

The operative contract language here, as the panel recognized, is in Article 8.5 of the License Agreement. There, BOT "agree[d] to pay all costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by [BI] in connection with the enforcement of

12

this Article 8 or of Article 5 provided that [BOT] is determined to be the breaching party." License Agreement § 8.5.

BI argues that this provision was satisfied here in connection with its counterclaim, insofar as (1) BI counterclaimed for breaches of License Agreement Articles 5 (governing BI's service marks and trade names) and 8 (governing, *inter alia*, advertising in connection with the Hawaii restaurant); (2) BI established such breaches during the arbitration; (3) BI obtained a ruling in the arbitration upholding termination as a contractual remedy for these breaches; and (4) BI incurred substantial attorneys' fees and costs in successfully litigating to this result. *See* BI Mem. at 12–16. BI argues that the panel, in denying such fees, misapplied Article 8.5.

BI's simple construction and consequent application of Article 8.5 is compelling. And, were the Court reviewing *de novo* BI's claim to reasonable fees and costs under Article 8.5, the Court would assuredly rule for BI. As BI notes, it prevailed in the arbitration. And the panel found that BOT was the breaching party, or "failed to comply with valid requirements under the license," Award at 2, and on that ground, sustained, by a 2-1 vote, BI's termination of the License Agreement on account of these breaches, *id.* at 22. Although determinations would be required both as to which fees and costs were traceable to the arbitration and as to the reasonableness (*i.e.*, non-excessiveness) of BI's overall fee claim, such pruning would affect only the amount of BI's fees and costs that BOT would be obliged to pay. It would not undermine BOT's duty to pay reasonable fees and costs "incurred by [BI] in connection with the enforcement" of Articles 5 and 8.

As the above case law reflects, however, the issue before the Court is not whether the panel correctly or incorrectly construed Article 8.5, or even whether its construction and application of that provision was sound or logically defensible. It is whether the panel's

13

construction had an anchor in the terms of the License Agreement, such that the Award can be viewed as "arguably derived," from that agreement. *Westerbeke*, 304 F.3d at 222. The panel's terse discussion in a single paragraph (¶ 88) of its Award leaves its reasoning more elusive than is ideal. However, the Court's evaluation of that discussion persuades the Court that the panel's application of paragraph 88, although reflecting a dubious interpretation of the License Agreement, was "arguably derived" from the terms of that contract.

In particular, the panel majority gave two reasons for not awarding BI fees and costs. Award ¶ 88. The first of these had an explicit anchor in the terms of Article 8.5. The panel majority relied on its construction of the term "enforcement" in that provision. The panel noted that the arbitration had been commenced "by BOT, not by BI seeking to enforce the Agreement." *Id.* And, the panel reasoned, in its counterclaim, BI had "only sought to terminate the agreement, rather than enforcing it." *Id.* For better or worse, the panel's articulation of this ground reflects a view that, under Article 8.5, "enforcement" of Articles 5 and 8 of the License Agreement presupposes that the agreement remained extant. The panel distinguished between "enforcing" these provisions and evaluating a termination of the Agreement premised on breaches of them. This interpretation is, in this Court's view, questionable: Insofar as the Agreement provides for termination as a remedy for designated categories of breaches, this supports BI's contrary position that termination is but one means of contractual "enforcement," albeit an ultimate one. But the panel's contrary construction of a contractual term, even if open to question, does not afford this Court any charter to disturb its Award. Put differently, the panel articulated at least "a barely colorable justification for the outcome reached," *Willemijn Houdstermaatschappij, BV*, 103 F.3d at 13 (citation omitted), and its stated reason for denying BI's fee application had an anchor in, and "dr[ew] its essence from," the terms of the License Agreement, *Eastern*

*Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62 (2000) (citation omitted). The Court thus lacks authority to overturn this aspect of the Award.

The second reason the panel gave for denying BI fees and costs was this: "The Panel also is mindful of the cost to BOT of the termination and potential financial benefit to BI in taking back the Benihana trademark in Hawaii." Award ¶ 88. Accordingly, "the Panel does not consider an award of attorney fees and costs pursuant to Article 8.5 mandatory or appropriate." *Id.* BI argues that the panel's assessment of what was "appropriate" was unmoored from the License Agreement and reflected an exercise of equity, so as to be an instance of an arbitral panel "effectively dispens[ing] [its] own brand of industrial justice." *Stolt-Nielsen*, 559 U.S. at 671. Because the panel did not explain the source of its authority to assess what was "appropriate," there is force to BI's critique that this rationale may have lacked a contractual root. However, for two independent reasons, this second justification does not merit vacating the Award.

First, and most important, as presented by the panel, this second justification appears to have provided an alternative basis for the Panel's denial of fees and costs. The Panel's use of the word "also" to preface this justification seemingly connotes that "the cost to BOT and potential financial benefit to BI in taking back the Benihana trademark in Hawaii" reinforced its earlier-stated contractual basis for denying fees and costs. On this reading, the panel's observations about what was "appropriate," even if read as extra-contractual, were not necessary to its outcome.

Second, at least as to the panel's denial of fees, the Court can find an arguable contractual basis for its rationale. Under Article 8.5, only "reasonable" fees incurred by BI were to be awarded. Arbitrators could read the capacious term "reasonable" to permit a wide-ranging

15

assessment of the equities of a fee award. The Panel's assessment that terminating the License Agreement would result in a financial windfall to BI—which could for the first time operate and profit from Benihana restaurants in Hawaii, including the brand's Honolulu flagship—could inform such an evaluation of reasonableness. The panel could have viewed BI's recovery from the lawsuit as "reasonable" as is, without any additional recompense of fees.[4] To be sure, the panel did not explicitly anchor the denial of fees in this contractual adjective, although it did quote Article 8.5, including the term "reasonable attorneys' fees," at the start of paragraph 88. And such a construction would not be the most natural, as the term "reasonable attorneys' fees" is more persuasively read to invite an evaluation of such factors as whether BI's counsels' attorney hours and workstreams were proportionate to the mission.[5] Nonetheless, the presence of the flexible standard of "reasonable[ness]" within Article 8.5 could have been read by the panel to confer upon it broad authority to assess whether an award of fees would be reasonable under the overall circumstances, including that, in the Award, BI had already exacted from BOT control of Hawaii operations, arguably the Benihana chain's crown jewel.

The authorities on which BI relies are inapposite. BI cites *DeGaetano v. Smith Barney, Inc.*, 983 F. Supp. 459 (S.D.N.Y. 1997), which found that arbitrators had acted in manifest disregard of statutory law where the panel "'appreciate[d] the existence of a clearly governing legal principle but decide[d] to ignore or pay no attention to it,'" BI Mem. at 11 (quoting *DeGaetano* at 464). But in *DeGaetano*, both sides had "unequivocally notified" the arbitrators

---

[4] As noted, the dissenting arbitrator made this same point in explaining his decision to join in the denial of fees and costs. *See* Dissenting Opinion of Arbitrator Zuffranieri ¶ 31 & n.12.

[5] This textual reading would also not justify the denial of costs incurred by BI in enforcing Articles 5 and 8, because, under Article 8.5, the word "reasonable" does not qualify the command that "all costs and expenses" incurred by BI be paid by BOT.

of "the governing legal principles [in Title VII employment discrimination] granting attorney's fees to prevailing plaintiffs." *DeGaetano*, 983 F. Supp. at 463. For *DeGaetano* to be apposite here would require that the meaning of Article 8.5 be "unequivocal" and "clearly established." But, in fact, there are no prior precedents definitively construing the terms of Article 8.5, the text of which the panel construed and applied. The panel thus did not ignore Article 8.5, but instead contended with it. And "[s]o long as the arbitrator was 'arguably construing' the contract—which this one was—a court may not correct his mistakes." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 572 (2013).

BI also attempts to cast *Bowery Residents' Comm., Inc. v. Lance Capital, LLC*, 995 N.Y.S.2d 2 (1st Dep't 2014), as constraining an arbitral panel's discretion to interpret contractual provisions for the award of attorneys' fees. *See* BI Mem. at 11. But *Bowery Residents* turned on the narrowness of the arbitration agreement at issue, which "unambiguously provided that '[t]he arbitrator will have no authority to make any ruling, finding or award that does not conform to the terms and conditions of this Agreement. . . . Hence, the arbitrator lacked any discretion under the agreement to decline to award petitioner its reasonable legal fees." 995 N.Y.S. 2d at 3. In contrast, the License Agreement language here conveyed broad authority on the arbitrators. It provides that "[i]f this Agreement shall be terminated by [BI] and [BOT] shall dispute [BI's] right of termination, or the reasonableness therefore, the dispute shall be settled by arbitration." License Agreement § 13.1. The panel therefore had broad authority to interpret the License Agreement. Moreover, in *Bowery Residents*, the relevant clause awarded fees to the *prevailing*

17

*party*, *see* 995 N.Y.S. 2d at 3, whereas under the License Agreement, BOT was obligated to pay only those fees incurred by BI's attempts to enforce it. License Agreement § 8.5.[6]

The Court is sensitive to BI's dismay at the denial of fees and costs, with BI having incurred, by its tabulation, more than $1.5 million in unreimbursed outside counsel fees and more than $300,000 unreimbursed costs on route to obtaining an award. In the end, however, the Court is constrained to remind BI, as it did in denying a similar bid in *Benihana III* to overturn part of an arbitral award, that BI's contractual decision in the License Agreement to commit resolution of such disputes to mandatory arbitration carried the risk of an unsatisfactory construction and application of the agreement. *See Benihana* III, 2016 WL 3913599, at *16. The Court there reminded BI of the Supreme Court's admonition to parties that "contemplate conventional litigation for the expedient of arbitration." *Id.*:

> The potential for [] mistakes is the price of agreeing to arbitration. As we have held before, we hold again: "It is the arbitrator's construction of the contract which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." The arbitrator's construction holds, however good, bad, or ugly.

*Oxford Health Plans*, 569 U.S. at 572–73 (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599 (1960) (alteration and internal citation omitted)).

## CONCLUSION

For the foregoing reasons, the Court confirms the arbitral Award in full and denies BI's petition to vacate the portion of the Award (¶ 88) denying it attorneys' fees and costs.

---

[6] The Illinois Appellate Court case cited by BI is similarly inapposite. The provision at issue provided that "[t]he non-prevailing party in any proceeding to enforce or contest any provision(s) of this Agreement . . . shall pay all reasonable costs, attorney's fees and expenses incurred by the prevailing party." *Spencer v. Ryland Grp., Inc.*, 865 N.E.2d 301, 303 (Ill. App. Ct. 2007).

SO ORDERED.

*Paul A. Engelmayer*
_____
PAUL A. ENGELMAYER
United States District Judge

Dated: January 17, 2019
       New York, New York